# Exhibit A

## Deposition Question Areas

1.  Defendants' activities in forming Freedom Wireless, Freedom Strategic, and the Nevada Partnerships.

2.  The responsibilities and activities of each Individual Defendant in connection with raising investor money and overseeing the 067 patent litigation.

3.  Defendants ownership interest in Freedom Wireless, Freedom Strategic, and the Partnerships.

4.  Defendants communications with Nevada investors.

5.  Defendants business activities in Nevada, including the identity of documents signed by Defendants that relate to Nevada activities.

6.  Defendants activities in arranging and participating in the November 26, 2007 meeting described in Plaintiff Johnson's affidavit.

7.  Defendants solicitations, communications, and meetings with potential and actual Nevada investors.

8.  The dates and circumstances under which Defendants have been present in Nevada.

388061

# Exhibit B

## Documents Requested

1.  All documents regarding the formation of Freedom Wireless, Freedom Strategic, and the Nevada Partnerships.

2.  All documents that Freedom Wireless, Freedom Strategic, and any of the Partnerships have filed with the State of Nevada, or any of its governmental subdivisions, since their inceptions. This request includes, but is not limited to, all annual lists required to be filed by Freedom Strategic and Freedom Wireless under N.R.S. 86.263 and N.R.S. 78.150

3.  All agreements among any of the Individual Defendants that relate to the 067 patent litigation.

4.  All employment or compensation agreements between the Individual Defendants on the one hand and Freedom Strategic or Freedom Wireless on the other hand.

5.  All documents that reflect compensation or other remuneration paid by Freedom Strategic, Freedom Wireless, or the Partnerships on the one hand to any of the Individual Defendants on the other hand from the inception of each entity.

6.  All documents that reflect any of the Individual Defendants' individual ownership or control interests in Freedom Strategic, Freedom Wireless, or the Partnerships from the inception of each entity.

7.  All documents used by the Defendants to solicit investment for the partnerships.

8.  A list of the names and address of each Nevada resident who invested in a Partnership.

9.  A list of the names and address of each Nevada resident who was solicited for a Partnership investment but who did not invest. This request also includes providing copies of all correspondence and written communications with the potential Nevada investors.

10. The complete file for each Nevada investor including all correspondence and documents circulated between the investor and Defendants.

11. All documents signed by any Defendant in connection with business in Nevada, including, for example, leases, bank accounts, hotel facilities, document storage, compliance with Nevada corporation, LLC, and Partnership laws, and compliance with Nevada tax laws.

12. All documents to which any Defendant is a party that provides for application of Nevada law.

13. Calendars, expense reports, plane tickets, and hotel receipts that show the date of each business visit by Defendants to Nevada regardless of whether personal activities were mixed with business activities.

14. The billing records for each Nevada law firm employed by the Defendants for any matter other than this lawsuit and the Crown litigation.

15. A list of the names and addresses of each Nevada person hired by Defendants for any full or part-time work. This request includes copies of all documents that will show the nature of the work or services provided.

16. The pleadings from all litigation in Nevada court to which defendants have been a party (exclusive of those in this case and the Crown litigation).

17. Documents showing the dates and amount of money raised from Nevada investors.

388062

# Exhibit C



**BONNETT, FAIRBOURN, FRIEDMAN & BALINT, PC**

JERRY C. BONNETT
FRANCIS J. BALINT, JR.
C. KEVIN DYKSTRA
ANDREW O. EVERROAD
KATHRYN A. JANN
GUY A. HANSON
MANFRED P. MUECKE¹
MICHAEL C. McKAY
TODD D. CARPENTER²
KRISTIN M. HACKIN
T. BRENT JORDAN
SAMANTHA M. DILLON

WILLIAM O. FAIRBOURN
VAN BUNCH
ELAINE A. RYAN
EDWARD O. COMITZ
PATRICIA N. SYVERSON
KIMBERLY C. PAGE
REBECCA L. COVELL
PATRICK T. STANLEY
WILLIAM F. KING
SCOTT C. DeVITO
ANDREW M. EVANS

ANDREW S. FRIEDMAN
ROBERT J. SPURLOCK
WENDY J. HARRISON
MICHAEL F. BEETHE
JONATHAN S. WALLACK
CHRISTINA L. BANNON
MEREDITH L. VIVONA
DANA L. HOOPER
TONNA K. FARRAR³
GARRETT W. WOTKYNS
M. JILL RENCHER

MICHAEL N. WIDENER, Of Counsel

¹ Admitted Only in California
² Admitted Only in California, Missouri and Kansas
³ Admitted Only in Pennsylvania and Minnesota

July 16, 2008

*Via U.S. Mail*

Jovan Vercel, Jr.
Kenneth M. Widner
Freedom Strategic Partners, LLC
101 Convention Center Dr., Suite 777
Las Vegas, Nevada 89109

RECEIVED
JUL 17 2008
BY

    Re:   *Royalty Participation Partnerships*

Dear Messrs. Vercel and Widner:

    This law firm represents Donavon Johnson, William Brooksbank, Kevin Burk and Joseph Mannix, all of whom are investor partners in the royalty participation limited partnerships for which Freedom Strategic Partners, LLC ("FSP") is the general partner, (the "Partnerships"). Richard Himelrick of Tiffany & Bosco, P.A. also represents these investors.

    Pursuant to NRS § 87.4335 and the governing partnership agreements, we request access to all books and records of the Partnerships pertaining to the period during which our clients were partners, including the records for the current and past six fiscal years. We intend to inspect the books and records and make arrangements to copy materials that we designate.

    This request for inspection extends to all of the books and records of the referenced Partnerships and to the Partnerships' income tax or information returns for each year. Without limiting the scope of this general request, we expect to inspect the following categories of documents:

- All Partnership agreements, amendments, business plans, internal reports or projections concerning revenues or royalties, notices of meetings, agendas, meeting minutes, solicitation materials and other partnership records.

July 16, 2008
Page 2

- Documents memorializing the ownership of property (real, personal, and mixed) as well as any property in which the Partnerships own an interest.

- Copies of the Partnerships' federal, state and local income tax or information returns and reports, if any, for the six most recent taxable years.

- The original Partnership Agreement – Royalty Participation Partnership (the "Partnership Agreement") for each of the Partnerships and all amendments thereto.

- Financial statements of each of the Partnerships for the six most recent fiscal years.

- All ledgers and journals required to be kept by generally accepted accounting principles; and correspondence and other books and records maintained in the ordinary course of business or otherwise.

- All accountings of the affairs of each of the Partnerships, including without limitation all accountings referenced in each of the Partnership Agreements.

- All settlements, licensing or royalty agreements and other documents reflecting or identifying any royalties, payments or other sources of income for the Partnerships, including any such documents relating to the following parties:

  o Convergys Corporation;

  o Verizon Wireless;

  o Virgin Mobile;

  o Boston Communications Group, Inc.;

  o Cingular Wireless;

  o Sprint Nextel;

  o Alltel;

  o AT&T Wireless; and

  o VeriSign, Inc.

July 16, 2008
Page 3

- For each of the foregoing settlements or agreements, all books, records and other documents showing: (1) all royalties, licensing fees, settlement payments or other payments or amounts received by Freedom Wireless Inc. ("FWI"), FSP or the partners of the Partnerships; and (2) all payments or other amounts disbursed by FWI, FSP or the Partnerships and the recipients of all such disbursements.

- Documents showing the following information for the Partnerships, including such information pertaining to the Notice/Proxy Statement or the Amended Royalty Agreement and Amended Partnership Agreement:

  o The terms, amounts and dates of receipt by FWI of any settlements of any litigation concerning Patent No. 5,722,067;

  o The parties, terms and amounts of all royalty or licensing agreements entered into by FWI and the amounts received by FWI under such agreements;

  o Information sufficient to compare the projected, expected or estimated income from any such settlements or licensing agreements under the initial Royalty Agreement dated August 1, 1998 and the related Partnership Agreement, on the one hand, and the Amended Royalty Agreement and Amended Partnership Agreement, on the other hand; and

  o The basis for the calculation of the "initial royalty payment" of $12,943,717.96 from FWI to FSP in October, 2007.

- All documents showing the sources and uses of revenues, income or other assets of the Partnerships.

- All documents showing the operating expenses and other expenses of the Partnerships.

- All documents showing the amounts raised or received from any partners or investors of the Partnerships or any other partnerships for which FSP serves as managing or general partner or showing the use of such funds.

- All agreements between or among any of the following parties or to which any of the following is a party: (1) FWI; (2) FSP; (3) the Partnerships; (4) Douglas Foughnies; (5) Larry Day; (6) Kenneth Widner; and/or (7) Jovan Vercel, Jr.

- Documents reflecting distributions, compensation or other amounts paid by FWI, FSP or any affiliated entity to: (1) Douglas Foughnies; (2) Larry Day; (3) Kenneth Widner; (4) Jovan Vercel, Jr.; and/or (5) Dan Harned.

July 16, 2008
Page 4

- Documents describing how the royalty payments from FWI to FSP were calculated or determined including, without limitation, the payments made in 2007 and 2008.

- Documents describing how payments or distributions to partners of the Partnerships were calculated or determined including, without limitation, the payments made in 2007 and 2008.

- All documents describing the nature, purpose, operations and finances of any offshore trust or entity, including the Grand Islands trust and documents describing the relationship of any such trust to FWI or FSP.

- All documents relating to the special meeting of partners for the Partnerships held on November 26, 2007, including all materials disseminated to partners, all presentation materials, all agendas or notes of presentations and all video or audio recordings of the meeting.

Please contact me to discuss the necessary arrangements for the inspection and copying of the foregoing partnership books and records. We would like to finalize these arrangements so that the documents can be inspected and copied within the forthcoming two weeks.

Very truly yours,

Andrew S. Friedman

ASF:ng
cc: Richard Himelrick

# Exhibit D

# Freedom Strategic Partners, L.L.C

General Business Plan

## Business Plan and Objective

The administration and collection of Royalty and License fees to be paid by all United States users of the Pre-Paid Switch-Based Debited Call Processing Technology For Wireless PCS and Cellular Telephone Systems

These Royalty and License fee rights are granted under a Royalty Participation Rights Agreement with Freedom Wireless Inc. Assignee of the patent identified as United States Patent Number 5,722,067

101 Convention Center Dr., Suite 777
Las Vegas, NV 89109
877-877-3327

DKJ 0294

# CONTENTS

## I. General Business Plan

U.S. Patent Number 5,722,067                          Page 3

Validity of Patent Number 5,722,067                  Page 3

Estimated Value of Patent Number 5,722,067           Page 3

Estimated Value of Royalty Shares                    Page 4

Assumptions                                          Page 4

Partnership Highlights                               Page 4

Budgeted Proceeds                                    Page 5

Use of the Proceeds                                  Page 6

Summary                                              Page 6

Organization                                         Page 7

Risk                                                 Page 7

*2*

DKJ 0295

### U.S. Patent Number 5,722,067

The patent was issued in February 1998, to Freedom Wireless Inc. The patent covers what has been described as the "transparent" method of allowing a cellular or wireless customer to make prepaid telephone calls on a wireless or cellular network. The method is described as "Switch Based Debiting" and is the most widely used method in the wireless communications industry for processing pre-paid cellular telephone calls. In June 1998, the company began sending notices throughout the United States to parties who the company believes may be required to obtain a license from Freedom Wireless Inc. in order to continue use, use, make, offer for sale or sell the technology that is covered under the patent.

### Validity of the 5,722,067 Patent

It is supported in patent law that there exists a statutory presumption of the validity of the patent. In other words, to be granted relief from the enforcement of a patent, the defendant or requesting party bears the burden of proof in an infringement litigation matter or any matter challenging the validity of one or more of the claims of a patent, whether the matter is an administrative or court proceeding. Specifically, _United States Code Title 35, Sections 281 through 285_ addresses the presumption of validity of each claim in a patent. Therefore, once a patent has been issued, any challenger to the validity of a patent claim has the burden of overcoming the presumption of validity set forth in the above referenced code if any relief is to be granted to them. All that is required by law to benefit from the rights granted under United States Code Title 35 is:

1. A valid and enforceable patent.
2. The right to prohibit others from using the invention unless a licensing or maintenance fee is paid to the owner of the patent.

By virtue of its' granting the patent, the United States Patent Commissioner according to the United States Code (cited above) grants to Freedom Wireless Inc. (the owner) the right to collect licensing or maintenance fees.

### Estimated Value of the Patent

| Year | | Subscribers (Million) | Revenues ($ Million) | Licensing/Royalty Assumption | Potential Value ($ Million) |
|---|---|---|---|---|---|
| 1 | 1999 | 5.3 | 2,284.3 | 5% | 114.215 |
| 2 | 2000 | 9.5 | 4,121.2 | 5% | 206.060 |
| 3 | 2001 | 13.3 | 5,702.7 | 5% | 285.135 |
| 4 | 2002 | 18.0 | 7,616.8 | 5% | 380.840 |
| 5 | 2003 | 23.7 | 9,952.7 | 5% | 497.635 |
| 6 | 2004 | 28.8 | 11,974.4 | 5% | 598.720 |
| 7 | 2005 | 34.8 | 14,300.9 | 5% | 715.045 |
| 8 | 2006 | 41.3 | 16,803.6 | 5% | 840.180 |
| 9* | 2007 | 41.3 | 16,803.6 | 5% | 840.180 |
| 10* | 2008 | 41.3 | 16,803.6 | 5% | 840.180 |
| | | | Total 106,363.8 | | Total 5,318.190** |

3

The "Subscribers" and "Revenues" numbers for years 1-8 in the previous chart were reported in the "2000 Frost & Sullivan" "U.S. Prepaid Wireless Services Market" Report.
*The "2000 Frost & Sullivan" Report only went through 2006, therefore the "Subscribers" and "Revenues" numbers for years 9 and 10 are estimates assuming no growth in those years.*
** *The Total Potential Value ($5.318 Billion) assumes there is no non-infringing alternative. It also assumes a 5% royalty is received by Freedom Wireless, Inc., in each of the years listed. This Potential Value is gross & pre tax. The potential value could be substantially less than $5.318 Billion if less than a 5% royalty is received by Freedom Wireless, Inc.*

## Estimated Value of the Patent Royalties

The royalty estimates developed are based on Freedom Wireless, Inc., receiving a 5% royalty on the projected yearly revenue figures and assuming no non-infringing alternative. A gross estimate can be predicted for revenue models for FSP's 30% royalty share according to its' agreement with Freedom Wireless assuming all Royalty Partnerships are filled. Using the potential value of future income of $5.318 billion, FSP's share could be net pre-tax royalty of approximately $1.595 billion in revenue.

## Assumptions that Predict Freedom Strategic Partners' License Fees

- ◆ Estimated total value of the patent royalty stream of $5.318 Billion.
- ◆ FSP is entitled to 30% of pre-tax income from royalties.
- ◆ FSP's predicted revenue is 30% of $5.318 Billion or $1.595 Billion.
- ◆ FSP's Partnerships would each be entitled to 1/20 of FSP's total pre-tax income.

## Partnership Highlights

Basically, the partnerships are each entitled to 1/20 of the total revenue from the patent licensing process. These partnerships are defined and operated according to the Partnership Agreements and are the final documents in the governance and operation of the partnerships and in defining participation. These are the general highlights:

- ◆ Each partnership will consist of 500 units, all with voting rights and completely vested.

- ◆ Of the 500 units, one-hundred twenty-five units (25%) will be allocated to Freedom Strategic Partners, L.L.C. (FSP) in exchange for its' royalty rights, organization fees, management services and general services. FSP will serve as the Initial Managing Partner. Three hundred seventy-five units will be allocated for individual partners to receive in exchange for a capital contribution of $1,000 per unit.

- ◆ Any individual, subject to the approval and acceptance by the Initial Managing Partner, may receive units in any number for capital contributions according to the "Partnership Agreement".

4

DKJ 0297

- The partnerships will last for ten (10) years from the date of the first capital contribution made on behalf of any partner.

- Distributions of royalties to the partnerships due under the agreement if received from Freedom Wireless Inc. will be made on the first day of any quarter for the quarter ending ninety days prior.

- Each partnership is expected to fund a maximum of $300,000 of the total budgeted expense related to the royalty process.

- Subject to a vote and approval of the partners, all royalties net of costs and expenses, received from Freedom will be distributed periodically to the partners according to their pro-rata share.

- All relevant developments made in the process of enforcing the patents will be available for review by the partners on the world wide web at the internet address:

## www.fsp.intranets.com

All relevant partnership business including budgets, financial statements, reports of royalty earnings, elections, etc. will be administered through the corporate office in Phoenix, Arizona or on the World Wide Web at:

## www.fsp.intranets.com

## Budgeted Proceeds

The budget for each partnership for the first four years, that is the use of the proceeds from the capital contributions will be as follows:

| Proceeds | |
|---|---|
| Use of Proceeds | $ 375,000 |
| | |
| Operating Expenses | $ 75,000 |
| Enforcement & Licensing Expenses | $ 300,000 |

The Initial Managing partner will retain in the partnership accounts for the duration of the partnership an initial sum of $75,000. Over the life of the partnership, the Managing Partner will pay from these funds the operating costs of the partnership such as those for record keeping, accounting, tax returns, legal costs if any, and other fees or expenses necessary to manage the partnership and its relationship with FSP. Partners will be provided with an accounting of the partnership funds at least every thirty days and upon any partner's request within 10 days. Eighty-percent of the partnership capital

5

DKJ 0298

contributions received will be used to pay expenses related to enforcement and licensing of the patent limited to a total of $300,000. Twenty-percent will be retained to fund the operating expenses of the partnership limited to a total of $75,000 as mentioned above.

There will be no minimum number of units funded in the partnership. However, the "Patent '067' Royalty Participation Rights Agreement" does specify that only a pro-rata share of royalties will be paid to a less than complete partnership. (e.g. if $100,000 is contributed as capital from a particular partnership, it will be entitled to 33.33 % of the maximum royalty payments defined in the "Patent '067' Royalty Participation Rights Agreement").

## Use of the Proceeds from the Royalty Participation Partnerships

In it's agreement with Freedom Wireless Inc., FSP agrees to provide $300,000 in working Capital from each Partnership for the purpose of paying the expenses of maintaining and licensing the patent. "Maintaining and Licensing" means the process of identifying and notifying the parties that the company believes need a license agreement, constructing and executing those agreements and accounting for royalties.

The projected budget for accomplishing the enforcement and licensing phase of Freedom Wireless' Business plan for four years is as follows:

| | |
|---|---:|
| **Legal and Litigation Expenses** | **$ 2,000,000** |
| **Facilities and Services** | |
| Rent and Utilities | 192,000 |
| Other | 8,000 |
| **Personnel and Salaries** | |
| Administration | 475,000 |
| Patent Technical Support | 320,000 |
| Licensing | 515,000 |
| Clerical and Support | 440,000 |
| **Licensing and Contracting** | |
| Travel Related | 460,000 |
| On-Site Accommodations | 420,000 |
| On-Site Contract Labor | 260,000 |
| Media and Marketing | 360,000 |
| **Budgeted Reserve** | 550,000 |
| **Total** | **$ 6,000,000** |

## Summary

It is the solitary business of Freedom Wireless Inc. (the company) to enforce its rights provided by ownership of patent '067'. The company believes it may take as long as four years before royalties if any are received as a result of its' enforcement and licensing activities. The company, however, believes in the validity of the patent and is allowing certain individuals to participate in the predicted benefits of ownership of the patent through its association with Freedom Strategic Partners, L.L.C.

6

DKJ 0299

## Organization

This document does not constitute a solicitation for an investment in the securities of any company. This document reveals the requirements and possible benefits of participation in a general partnership. The purpose of the general partnership(s) is to pay the expenses and administer the expected royalty process related to patent licensing and maintenance in exchange for the right to participate in the patent holding company's predicted future income from its ownership rights under U.S. Patent Number 5,722,067. The partnerships are authorized to be formed by Freedom Strategic Partners, L.L.C., (FSP) a Nevada Limited Liability Company, for which FSP will act as the Initial Managing Partner. FSP has entered into an agreement with Freedom Wireless Inc. (the owner of the Patent) to form and manage the partnerships and takes full responsibility for their organization and management subject to the "RP partnership Agreement". For its participation FSP will be granted 125 partnership units from a total of 500 available units in each partnership.


## RISK

There are real risks involved in participating and no assurances can be made that any income will ever be received from its patented technology. Each individual should carefully investigate the information provided regarding the patent and its worth and make a decision to participate only on its suitability for them. The partnership units are not securities and have no marketability as such. The partnership capital contribution value is arbitrary and does not necessarily reflect a true or fair value.

ANY MONEY CONTRIBUTED TO THE PARTNERSHIP REPRESENTING THE INDIVIDUAL CAPITAL ACCOUNTS OF THE PARTNERS (CALLED PARTNERSHIP UNITS) SHOULD BE CONSIDERED A LONG TERM INVESTMENT WITHOUT LIQUIDITY. ALTHOUGH THE PARTNERSHIP MAY BE ENTITLED TO IMMEDIATE REVENUE IN ACCORDANCE WITH ITS PARTNERSHIP AGREEMENT, IT IS ESTIMATED THAT INCOME UNDER THE AGREEMENT MIGHT BE ACCRUING TO THE PARTNERS BUT MAY NOT BE ACTUALLY RECEIVED FOR QUITE SOME TIME. IN FACT, THERE IS A POSSIBILITY THAT EACH PARTICIPANT COULD LOSE HIS OR HER ENTIRE CAPITAL ACCOUNT AND RECEIVE NO FUTURE DISTRIBUTIONS. THEREFORE, PARTICIPATION IN THE PARTNERSHIP SHOULD BE CONSIDERED ONLY BY THOSE WHO CAN DO SO KNOWING THAT THERE WILL BE NO IMMEDIATE CASH DISTRIBUTIONS TO THE PARTNERS, IF ANY, IN THE NEAR FUTURE OR OTHERWISE *AND* THAT PARTICIPATION SHOULD BE CONSIDERED BY THOSE FOR WHOM IT WILL HAVE NO ADVERSE AFFECT ON THEIR PERSONAL FINANCIAL HEALTH OR WELL BEING SHOULD THEIR CAPITAL ACCOUNT NOT BE RETURNED TO THEM BY MEANS OF A DISTRIBUTION OF PROFITS OR EARNINGS RECEIVED BY THE PARTNERSHIP. PARTICIPATION IN THIS PARTNERSHIP IS RISKY AND SHOULD BE CONSIDERED SO FOR FINANCIAL PLANNING PURPOSES.

7

DKJ 0300

# Exhibit E

# Partnership Agreement

### Royalty Participation Partnership

## ARTICLE I - FORMATION AND BUSINESS

**Formation.** The Partners hereby associate themselves in a general partnership (the "Partnership") whose domicile shall be 101 Convention Center Dr. Suite 777 Las Vegas, Nevada 89109, in accordance with the terms and conditions contained herein. Following the formation of the partnership, the partners shall register or file any and all necessary registrations or filings for the operation of a general partnership in the state of Nevada and shall execute and file such further documents and take such further action as shall be appropriate to comply with the requirements of law for the operation of a general partnership wherever the partnership transacts business.

**Business.** The business of the partnership shall be to administer, and collect royalties according to a "Patent Royalty Participation Rights Agreement" with Freedom Strategic Partners, LLC and Freedom Wireless Inc., Nevada corporations. The partnership shall acquire such property as may be appropriate to transact such business and take all acts as may be appropriate to conduct such business and may sell or otherwise dispose of such property upon a decision of the partners.

## ARTICLE II - NAME AND PLACE OF BUSINESS

**Place of Business.** The partnership's place of business shall be in the offices of Freedom Strategic Partners, L.L.C. 101 Convention Center Dr. Suite 777 Las Vegas, Nevada 89109.

**Name.** The partnership business and activities shall be conducted under the name, RP____ General Partnership and under any variations of this name which may be necessary to comply with the laws of the other states in which the partnership may transact business.

**Nature of Partners' Interests.** The interests of the partners shall be prorated with their quantity of units held in the partnership. All property owned by the partnership whether real or personal, tangible or intangible shall be deemed to be owned by the partnership as an entity.

**Title to Assets.** Title to assets acquired by the partnership shall be held in the name of the partnership. The partners shall execute, file and record such documents as may be necessary to reflect it's ownership of the assets in such public offices in such states as may be required by law.

## ARTICLE III-DEFINITIONS

**Agreement.** "Agreement" means this partnership agreement, as amended from time to time. Words such as "hereof", "hereinafter", "hereof", "hereto" and "hereunder" refer to this agreement as a whole, unless the context otherwise requires. References to a section or article without other reference shall refer to this agreement.

**Assignee.** "Assignee" shall have the meaning set forth in Article 8.

**Capital Account.** "Capital Account" means an individual capital account maintained for each partner in accordance with the following provisions:

(a) To each partner's capital account there shall be credited such partner's capital contributions, as defined below, such partner's distributive share of net profit, as defined below, and any items in the nature of income or gain that are specially allocated and the amount of any liabilities assumed by such partner or secured by any property distributed to such partner.

(b) To each partner's capital account there shall be debited the amount of cash and the gross asset value of any property distributed to such partner pursuant to any provisions of this agreement,

1

such partner's distributive share of net loss, as defined below, and any items in the nature of expenses or losses which are specially allocated pursuant to the terms hereof, including the costs of operating the partnership. In the event any units are transferred in accordance with the terms of this agreement, the transferee shall succeed to the capital account of the transferor to the extent it relates to the transferred units.

(c) For purposes of allocation, there shall be taken into account IRS Code, Article 752 and the applicable regulations.

(d) The foregoing provisions and the other provisions of this agreement relating to the maintenance of capital accounts are intended to comply with Regulations Article 1.704(b), and shall be interpreted and applied in a manner consistent with such Regulations. The partners also shall make any appropriate modifications in the event unanticipated events might otherwise cause this agreement not to comply with Regulations Article 1.704(b).

**Capital Contributions.** "Capital Contributions" shall mean the total amount of cash and fair market value, as agreed upon by the partners, of any property other than money contributed by a partner to the partnership.

**Code.** "Code" means the Internal Revenue Code of 1985, as amended from time to time (or any corresponding provisions of succeeding law).

**Distributable Cash.** "Distributable Cash" means the amount by which the total cash received by the partnership from all sources exceeds the reasonable working capital requirements of the partnership. The reasonable working capital requirements of the partnership shall include, without limitation, the requirements of the partnership to service its debt and other current obligations and to provide reasonable partnership reserves under all current or reasonably anticipated circumstances.

**Gross Asset Value.** "Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, as adjusted from time to time as the partners may elect within the rules set forth in the Code.

**Initial Managing partner.** "Initial Managing partner" shall mean the person set forth in the introduction to this agreement or any successor properly elected by the partners.

**Net Profit and Net Loss.** "Net Profit and Net Loss" means, for each fiscal year or other period, an amount equal to the partnership's taxable income or loss for such year or period.

**Partners.** "Partners" shall mean and refer to those persons or entities admitted to the partnership as partners and to whom units shall have been issued as provided herein.

**Regulations.** "Regulations" shall mean and refer to the federal income tax regulations which are the official Treasury Department interpretations of the Code.

**Units.** "Unit" or "Units" shall mean an interest in the partner represented by a contribution to the partnership by a partner.

**Voting partner.** "Voting partner" means those partners who hold voting units and are therefor entitled to vote on partnership business.

**Voting Units.** "Voting Units" means units of the partner entitled to vote on all matters provided for in this agreement.

## ARTICLE IV – CAPITALIZATION

**Capital Contributions.** The partnership shall consist of a maximum of Five Hundred (500) units.

The Initial Managing partner shall receive 125 voting units for serving as such partner. Such units shall have a market value per unit equal to that of all other partners for the purpose of establishing its capital contribution.

Each partner's capital contribution for units shall be held by the Initial Managing partner and expended for the partnership's business purposes.

**Issuance of Units.** Upon the making of a contribution to the capital of the partnership as provided herein, each partner shall be issued a certificate representing the appropriate number of units. Each partner understands, acknowledges and agrees that his/its interest in the profits and losses of the partnership as represented by a unit shall be diluted to the extent additional partners are admitted to the company and additional units are issued.

**Additional Units.** In the event that the partnership is required to seek additional funding in order to carry out its business, in addition to any loans which may be obtained, a majority of the voting units outstanding, shall, at a meeting of partners called for that purpose or by written consent, authorize the sale of additional voting units beyond the 500 authorized at a price or prices to be determined by such majority vote. Provided, however, before the partnership shall sell any additional units, it shall first offer each existing partner the right but not the obligation to purchase additional units on a pro rata basis, which right expires after a period not to exceed 30 days. The partners who elect to purchase additional units shall have the additional right to purchase any units not taken. This additional right shall again be on a pro-rata basis. The exercise of all rights offered under this provision shall be indicated in writing.

**No Withdrawal.** A partner may not withdraw from the partnership

**Interest.** No partner shall receive any interest on his capital contributions to the to the partnership.

## ARTICLE V – ALLOCATION OF PROFITS AND LOSSES

**Allocation of Net Profit and Net Loss.**

**Net Profit.** Unless otherwise provided in this agreement, net profit for any fiscal year shall be allocated to the partners in the following order and priority: First, to the partners in proportion to the cumulative net loss previously allocated to the partners herein, until, the net profit allocated to the partners pursuant to this section equals the cumulative net loss previously allocated to the partners herein. Second, to the partners, pro-rata, in accordance with the negative balances of the partner's capital accounts, until each is brought to zero. Thereafter, the balance, if any, to the partners in proportion to the number of units owned by each.

**Net Loss.** Unless otherwise provided in this agreement, net loss for any fiscal year shall be allocated to the partners in the following order and priority: First, to the extent net profit has been allocated for any prior year, net loss shall be allocated to offset any net profit allocated above, such allocations to be in the same proportions as net profit was allocated, Second; to the partners, pro-rata, in proportion to the positive balance of the partners capital accounts, until it is reduced to zero. Thereafter, the balance, if any, to the partners in proportion to the number of units owned by each.

**Allocation of Basis.** A partner's basis in his units shall equal the capital contribution of the partner. Such partner's basis shall be increased by the amount of any further contributions to the partnership by such partner's share of any increase in partner liabilities, and by the partner's distributive share of taxable income of the partnership and tax exempt receipts of the partnership, and shall be decreased but not below zero by distributions from the partnership to the partner and by the partner's distributive share of losses and expenditures which are neither deductible nor capital expenditures.

III

## ARTICLE VI – DISTRIBUTION TO PARTNERS

**Distribution of Distributable Cash.** Distribution of distributable cash shall be distributed to the partners in the following order and priority. First, to the partners to the extent all partners have positive adjusted capital contributions in proportion to the number of units, and thereafter, the balance, if any, to the partners in proportion to their adjusted capital accounts.

**Timing of Distributions.** Distributions of distributable cash shall be made as determined by vote of the partners or on December 31.

**Amounts Withheld.** All amounts withheld pursuant to the Code or any provision of any state or local tax law with respect to any payment or distribution to the company or the partners shall be treated as amounts distributed to the partners pursuant to this article for all purposes under this agreement.

**Consent by Partners.** The methods herein above set forth, by which net profit, net loss and distributions are allocated and apportioned, are hereby expressly consented to by each partner as a specific condition to becoming a partner. Each partner covenants that it/he will make no claim or representations concerning the income tax effects of the provisions contained in this agreement which is inconsistent with the provisions of this agreement.

**In-Kind Distributions.** To the extent that non-cash assets are distributed to the partners, the fair market value of such assets shall first be determined and the capital accounts of the partners shall be adjusted, to reflect any gain or loss which would have been generated had the assets been sold for their determined value. Such assets shall then be distributed in accordance with such valuation. Non-cash assets (including, but not limited to, promissory notes) received by the partnership in connection with the sale or other disposition may be distributed in kind to the partners or to a collection account with the proceeds to be distributed in accordance with the terms of this section as received. The fair market value of assets distributed in kind under this section shall be equal to a sum established by the partners.

**Assignment of Units.** If a partner assigns all or part of its/his units, to another entity/person during any fiscal period under a transfer permitted by this agreement, allocations relating to said units for tax and accounting purposes shall be divided and allocated between the transferor and the transferee on the basis of the number of days during the period each was the holder of the units. If allocations and distributions are not permitted to be made, under Article 706 of the Code in accordance with the preceding sentence, such allocation shall be made as selected by the partners.

**Return of Excess Distributions.** Any other provisions of this agreement to the contrary notwithstanding, if the partnership incurs expenses or liabilities in excess of assets of the which are readily accessible and usable for the payment of debts, and the partnership has previously made distributions to the partners, the partners agree to contribute cash to the partnership in an amount sufficient to satisfy such liabilities or expenses up to the amount of such prior distributions within 60 days after written demand. Such contributions shall be made in reverse order of receipt of prior distributions. Partners shall not otherwise be required to contribute to the capital of the company other than as stated herein.

## ARTICLE VII – MANAGEMENT OF COMPANY AFFAIRS

**Voting.** Whenever a vote, agreement, decision, action or determination respecting the management, operation or control the partners is required to be made by the provisions of this agreement or otherwise, a majority of the voting units shall constitute approval by the partners unless otherwise provided in this agreement. Wherever a vote, agreement, decisions, action or determination of a committee of the partners or the Managing Partner(s) is required or permitted to be made by this agreement or otherwise, a vote of the majority of such persons shall constitute approval. A vote may be cast in person, by telephone, in writing or by power of attorney to another partner. A partner who fails to vote on any matter after the sending of notice to such partner as required by this agreement, shall be deemed to have given his/her power of attorney to the Managing partner(s). However, this agreement may not be amended to alter the allocations to partners made hereunder or to reduce the percentage interest required to approve any act without the consent of at least two-thirds of the partners affected by such action.

IV

**Management** PARTICIPATION IN THIS PARTNERSHIP IS NOT A PASSIVE INVOLVEMENT. THE PARTNERSHIP IS MANAGED BY THE PARTNERS THEMSELVES. EACH AND EVERY PARTNER IS REQUIRED TO ACTIVELY PARTICIPATE IN IMPORTANT BUSINESS DECISIONS AFFECTING THE PARTNERSHIP BY EXERCISING HIS/HER VOTING PRIVILEGES. PARTNERS SHALL BE ASKED TO PARTICIPATE IN ONE OR MORE COMMITTEES WHICH SHALL OVERSEE AND CONDUCT IMPORTANT BUSINESS. THESE COMMITTEES SHALL INCLUDE THE FOLLOWING:

ACCOUNTING
PUBLIC RELATIONS
STANDARDS
INSURANCE
LEGAL
COMPANY COMMUNICATIONS NEWSLETTER
PLANNING, BUDGET AND FINANCE
MARKETING

By establishing the above committees each partner will have the opportunity to be involved in some of the day-to-day management of the business of the partnership, and have meaningful input by utilizing his/her personal and business expertise and experience in the performance of his/her duties, even if he/she may be located at some distance from the partnership's place of business. Thus, each partner will have active control of the partnership's affairs. In order to further enhance the ability of the partners to effectively exercise their power, the partnership will hold formal and informal committee and company meetings at various geographic locations including the offices of the partnership's place of business. All meetings will be open to attendance by all partners either in person, by conference telephone, by video teleconference or otherwise. The partnership will have an internet site for discussion and voting on the affairs of the business and for retrieving records and documents.

**Initial Managing partner.** The Initial Managing Partner shall be responsible for managing the organization and initial capitalization of the partnership and for administration duties. The Initial Managing partner shall be obligated to devote its best efforts (but not on an exclusive basis) to the partnership affairs. The Initial Managing Partner shall become the Managing Partner 30 days after the first capital contribution is made by any partner and shall terminate upon a proper election naming a replacement by the partners.

**Managing Partners.** The Partners recognize that it may be in the best interests of the partnership and voting \partners to facilitate the conduct of day-to-day business affairs of the partnership at some point by designating and appointing up to three partners as business managers. Upon request from the Managing Partner an election will be conducted to appoint as many as three Managing Partners. One minimum must be in office at all times and one minimum must be elected from candidate(s) suggested by Freedom Strategic Partners, L.L.C.

**Compensation of Managing Partners.** Managing Partners as such, shall receive a stated salary or other compensation for their services, and may receive such compensation for their services as may be reasonable for the services provided In addition, the partners may agree to pay Managing Partners a fixed sum and expenses for attendance, if any, at each regular or special meeting of the Managing Partners provided that nothing contained in this agreement shall be construed to preclude any Managing partner from serving in any other capacity and receiving compensation for such service.

**Representations of Partners.** Each partner represents and warrants that the success of the business will depend upon the active participation and involvement in company matters of all partners. Each partner undertakes and agrees to devote such time and energy as is reasonably necessary to assist in the management of the business and use his best efforts to make himself available for participation at meetings or in actions by written consent.

**Restrictions on Authority of Partners.** Without a vote of the voting partners, a partner, the initial managing partner and the managing partners shall have no authority with respect to the partnership and this agreement to: Do any act in contravention of this agreement, Do any act which would make it impossible to carry on the partnership business, possess partnership property or assign the right of partnership or its partners in specific property for other than a partnership purpose, Assign the partnership property in trust for creditors or on the assignee's promise to pay

v

the debts of the partnership, confess a judgment, or admit a person as a partner except as otherwise allowed in the partnership agreement..

Without a vote of the Managing Partners or the voting partners, the Initial Managing partner may not enter into any single obligation involving a total obligation of five thousand dollars ($5,000.00) or more, or obligate the partnership beyond its total cash available minus it's total liabilities.

**Liability and Indemnity of the Partners.** No partner shall be liable to the other partners for the performance of any act or for its/his failure to act, as long as it/he is not found by a court of competent jurisdiction to be liable for fraud, gross negligence or bad faith in such performance or failure. The partnership shall advance expenses for and indemnify each partner, any employee or agent of each partner, and any employee or agent, against any loss or threat of loss as a result of any claim or legal proceeding related to the performance or nonperformance of any act concerning the activities of the partnership provided, however, with respect to the subject matter of the claim or legal proceeding, this indemnification shall be effective only so long as any party against whom the claim is made is not found liable for fraud, gross negligence, willful misconduct or bad faith in such performance or nonperformance. Furthermore, each partner shall not be personally liable or accountable for any loss or threat of loss, as a result of any claim or legal proceeding of whatever nature, for such loss or threat of loss arising from operative facts and events which occurred, prior in time, to admission of the partner into the partnership. The indemnification provided herein shall include payment of reasonable Attorney's fees. Or other expenses incurred in settling any claim or threatened action or incurred in any finally adjudicated legal proceeding, and the removal of any liens affecting any property of the indemnitee shall be made from the assets of the partnership. All judgments against the partnership, wherein a partner (including any employee, partner, officer and/or director of a partnership) is entitled to indemnification shall first be satisfied from partnership's assets. No partner shall have liability to any other partner if, upon audit, the Internal Revenue Service disallows any deduction or allocation taken , or if any governmental regulatory agency determines that any action taken by the partnership or any partners on behalf of the partnership violates any State or Federal regulatory provision. The indemnification provided by this section  is specifically intended to apply not only to each partner but also to the Initial Managing Partner.

**Removal of the Initial Managing partner.** The partners shall have the right to remove the Initial Managing Partner and to elect a successor by virtue of a majority vote of the partners. A special meeting is to be called for such a purpose if the Initial Managing Partner materially fails to carry out his duties according to the terms of this agreement.

**Meetings of Partners.** The partners shall hold regular quarterly meetings at times and places to be selected by the voting partners. The organizational meeting of the partners shall be held upon the called notice of the Initial   Man-aging partner not later than 60 days following admission of at least one-hundred voting partners at which Managing Partners may be elected.  Any partner may call a meeting upon 30 days' notice.  Except at regular quarterly meetings, notice shall set forth the action proposed to be taken. Any voting partner may waive notice of or attendance at any meeting, or may execute a signed written vote or consent. The partners shall keep written documentation of all their meetings,  which shall be contained in the records of the partnership.

**Action Without Meeting.** Any action that may or is required to be taken at a meeting of the voting partner may be taken without a meeting if written consent setting forth the action to be taken is signed by sufficient partners entitled to vote to have approved the action at a meeting. This consent shall have the same force as a vote of the voting partners.

**Independent Activities.** Each and every partner has a fiduciary duty to the partnership and hereby acknowledges such responsibility.

VI

## ARTICLE VIII – RESTRICTIONS ON TRANSFER OF UNITS

Except as provided below, no partner may sell, convey, assign, pledge, hypothecate, or encumber all or a portion of its units, unless it first complies with the following conditions.

**Time Limitations.** If a partner is eligible to transfer a unit to a third party as provided in this Article, such transfer shall only occur on the last calendar day of each month.

**Limitations on Transfer.** No partner shall transfer any units unless there will be no adverse tax or other implications to the partnership as a result of the transfer of the units and that the transfer is in compliance with applicable laws and regulations.

**Permitted Transferees.** Any partner may, without the consent of the other partners, may transfer or assign his units to the following ("Assignee"); To the partnership or to any other partner, To any individual or entity by succession or testamentary disposition, To himself as trustee of a trust for the benefit of himself, his spouse, or his children, or to any immediate family member or to any other entity may agree to such a transfer provided it does not by virtue of the transfer create an identifiable conflict of interest for the partner's or the partnership.

**Distributions.** The partnership shall be entitled to treat the assignor of such units as the absolute owner thereof in any respects, and shall incur no liability for allocations of net income, net loss, distributions or transmittal of reports and notices required to be given to a partner hereunder which are made in good faith to the assignor prior to such time as the written instrument of assignment has been received by the company and recorded on its books, or prior to the effective date of such assignment. The effective date of such assignment of units, on which the assignee shall be deemed the partner of record, shall be the first day of the first full calendar month following the satisfaction of all of the conditions set forth below. The allocations and distributions attributable to the units acquired by reason of such assignment shall be divided among and allocated between the assignor and assignee of such units as provided above.

**Conditions of Substitution.** No assignee shall have the right to become a partner in place of its/his assignor unless all of the following conditions are first satisfied: A duly executed and acknowledged written instrument of assignment shall have been filed with the partnership, which, instrument shall set forth the name of the assignor, the name, address and social security or identification number of the assignee, the date of transfer, the number of units being assigned and the intention of the assignor that the assignee become a partner in its/his place to the extent of the assigned units. The assignor and assignee shall have executed such other instruments as the other partners may deem necessary or desirable to effect such substitution (including without limitation, the written acceptance and adoption by the assignee of the provisions of this agreement, as amended), the consent of the partners shall be granted, and the conditions of this section are satisfied.

## ARTICLE IX – TERM

**Term.** The partnership shall commence on the date of this agreement subject to any limitations or instructions to the contrary within the agreement and shall dissolve on the earlier of:

A written agreement signed by all the partners, Dissolution for any reason that may be set forth herein, Or 10 years from the date hereof.

## ARTICLE X – DISSOLUTION

**Causes of Dissolution.** The partnership shall be dissolved on the earliest to occur of the following:

Any dissolution event provided by law or by a majority vote of the partners.
Any term of this agreement that provides for dissolution.

Provided that; When a new partner is admitted to the partnership, or a person ceases to be a partner, the remaining Partners shall be deemed to have agreed to continue the business of the Partnership under the terms of this Agreement unless Partners holding a majority of the Voting Units vote to allow the partnership to be dissolved and

VII

such vote occurs within 90 days of the event otherwise causing dissolution. Upon the occurrence of such an event, the partner shall promptly provide notice to all partners.

**Winding Up the Partnership.** Upon a dissolution of the partnership, the Initial Managing partner, the Managing Partners, or, in the event there are none, the person(s) elected by the Partners, shall take full account of the assets and liabilities, shall liquidate the assets as promptly as is consistent with obtaining the fair market value thereof, and shall apply and distribute the proceeds therefrom in the following order: To the payment of claims of creditors, including the Partners, in the order of priority as provided by law, To set up any reserve which the liquidator deems reasonably necessary for contingent or unforeseen liabilities or obligations, To the partners and former Partners in satisfaction of liabilities for distributions owing prior to the dissolution, and the balance, if any, to the Partners in accordance with the formula for distribution under Article 6.

## ARTICLE XI – ACCOUNTING

**Method of Accounting.** At all times during the existence of the partnership, the partnership shall keep full and true books of account into which shall be entered fully and accurately each transaction of the partnership. The partnership books shall be kept on a cash or accrual basis as may be determined by the Partners. All Partners and their designated representatives shall have reasonable access to and may inspect and copy all records.

**Fiscal year.** The fiscal year end of the partnership shall be December 31.

**Accounting Elections.** All unusual or unclear accounting and tax elections and decisions that will be binding upon the partners and are required to be made in connection with the preparation of partnership financial statements and/or tax returns shall be made by the partners. Otherwise, the Initial Managing Partner or the Managing Partner if he/she has succeeded the Initial Managing Partner shall make those decisions in accordance with the Tax Code and Generally Accepted Accounting Principles for expediency.

**Partner Accounts.** All funds of the partnership shall be deposited in its name in accounts maintained at whatever institution as directed and approved by the partners. Checks shall be drawn upon the partnership accounts only for partnership purposes. The Initial Managing Partner is authorized to establish any partnership accounts and deposit therein capital contributions. The Initial Managing partner shall act as a signatory on such accounts until directed otherwise by the Managing Partners or the partners.

**Tax Status, Tax Account and Tax Elections.** For federal and state income tax purposes except as otherwise provided in this agreement, all income, deductions, credits, gains and losses of the partnership for the current year shall be allocated to the partners pursuant to the terms set forth herein above. And, shall be as determined by the accountant for the partnership. The Initial Managing partner shall be the Tax Matters partner as required by the Code. The Partners shall designate all successors. Any provision of this agreement to the contrary notwithstanding, (for federal income tax purposes only) each partner recognizes, that the partnership will be subject to all provisions of Subchapter K of Chapter 1 of the Code, provided, however, the filing of U.S. Partnership Returns of Income shall not be construed to extend the purposes of the partnership or expand the obligations or liabilities of the partners. Prompt notice shall be given to the partners upon receipt of notice that either the Internal Revenue Service or any state or local taxing authority intends to examine the partnership tax returns for any year.

**Books and Records.** Proper books and records for at least the current and past six fiscal years shall be kept regarding all partnership transactions, and each partner shall have access to such books and records during business hours. The books shall be kept in a manner of accounting agreed upon by the partners. The books and records shall designate and identify any property in which the partnership owns a beneficial interest. The records shall include, but shall not be limited to the following: The ownership of property (real, personal, and mixed) as well as any property in which the partnership owns an interest. A current list of the full name and last known business or residence address of each partner set forth in alphabetical order together with the number of voting and non-voting units owned by each partner. Copies of the partnership's federal, state and local income tax or information returns and reports, if any, for the six most recent taxable years. The original Agreement and all amendments thereto, Financial statements of the partnership for the six most recent fiscal years. All ledgers and journals required to be kept by generally accepted accounting principles, and correspondence and other books and records maintained in the ordinary course of business or otherwise. Any partner or his duly authorized representative shall have the right,

VIII

upon reasonable request, to inspect and copy (at the inspecting partner's expense) any of the foregoing partnership's records during normal business hours and to obtain promptly, after becoming available, a copy of the partnership's income tax or information returns for each year.

**Reports.** A complete accounting of the partnership affairs as of the close of business on the last day of December of each year shall be rendered to each partner within 90 days after the close of each such period. Except as to manifest errors discovered within 30 days after its rendition, each such accounting shall be final and conclusive as to each partner.

## ARTICLE XII – AMENDMENTS

**Amendments in General.** This Agreement and any amendments may be amended only in writing adopted in accordance with this agreement.

## ARTICLE XIII – GENERAL PROVISIONS

**Notices and Addresses.** All notices, offers, acceptances and any other acts under this agreement (except payment) shall be in writing. And, shall be sufficiently given if delivered to the addresses in person, by Federal Express or similar receipted delivery, by facsimile delivery or, if mailed, postage prepaid, by certified mail, return receipt requested, addressed to the addresses of the partners indicated in this agreement or to such other addresses as the partners, by written notice to the other partner(s), may designate from time to time. Such notices shall be deemed delivered upon receipt, if personally delivered or delivered by receipted delivery, three business days after deposit in the mail, if mailed and upon the transmission confirmation receipt from the sender's facsimile machine, if by facsimile delivery.

**Further Actions.** The Partners agree to execute such documents or perform such acts as may be reasonably necessary in order to give effect to the intentions expressed in this Agreement.

**Limited Power of Attorney.** By the execution of this partnership agreement, each partner appoints the Initial Managing partner and each Managing partner as his Attorneys-in-fact, in his name, place and stead, to execute, acknowledge and file all documents necessary to create or qualify the partnership as such, and if necessary to withdraw such registration and to dissolve the partnership.

**Interpretations, Severability.** The captions used in this Agreement are for convenience only and shall be used in interpreting this Agreement. If any portion of this Agreement shall be held invalid or inoperative, the remainder of this agreement shall be considered valid and operative, and unless otherwise prohibited by law, effect shall be given to the intent manifested by that portion of the agreement held invalid or inoperative.

**Successors and Assigns.** This Agreement shall bind the partners, their successors, heirs, personal representatives, and assigns. Nothing herein contained shall affect any restrictions on transfers or assignments set forth elsewhere in this Agreement.

**Costs and Attorney's Fees.** In the event that there is any controversy or claim arising out of or relating to this agreement, or to the interpretations, breach or enforcement, thereof, and any actions or proceeding is commenced to enforce the provisions of this agreement, the prevailing party shall be entitled to a reasonable Attorney's fee including the fees on appeal, costs and expenses.

**Right to Rely on the Authority of a Partner.** No person dealing with a partner shall be required to determine its/his authority to make any commitment or undertaking on behalf of the partnership nor to determine any fact or circumstance bearing upon the existence of their authority. In addition, no purchaser of any property or interest owned by the partnership shall be required to determine the sole and exclusive authority of a partner to sign and deliver on behalf of the partnership any such instrument or transfer, or to see to the application or distribution of revenues or proceeds paid or credited in connection therewith unless such purchaser shall receive written notice affecting same.

IX

**Counterpart Execution.** This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto have signed the same document. All counterparts shall be construed together and shall constitute one Agreement.

**Time.** Time is of the essence with respect to this Agreement.

**Meaning of Terms.** Where the context so requires, the use of the neuter gender shall include the masculine and feminine genders, the singular shall include the plural and vice versa, and the word "person" shall include corporation, firm, partnership or other form of association.

**Governing Law.** This Agreement shall be governed and construed in accordance with the laws of the State of Nevada, including, without limitation, to the extent permitted by law. Any action to interpret or enforce this agreement shall be solely brought in the State of Nevada. To the extent permitted by law, the parties agree that the sole venue for such actions shall be Las Vegas Nevada.

**Incorporation of Synopsis.** Each prospective partner acknowledges the receipt, and has read and understands, the document identified as the Business Plan and agrees that it is incorporated herein by reference.

## ARTICLE XIV – REPRESENTATION AND WARRANTIES

EACH VOTING PARTNER CONTRIBUTING CASH DOES HEREBY REPESENT AND WARRANT THAT SUCH PARTNER: HAS RECEIVED AND EXECUTED A COPY OF THE PARTNERSHIP AGREEMENT. UNDERSTANDS THE AUTHORITY TO MANAGE AND CONTROL THE BUSINESS OF THE PARTNERSHIP AND ITS ASSETS VEST IN THE PARTNERS, INCLUDING THE APPOINTMENT AND REMOVAL OF THE MANAGING PARTNERS. UNDERSTANDS THAT THE SUCCESS OF THE PARTNERSHIP'S BUSINESS WILL DEPEND UPON THE ACTIVE PARTICIPATION AND INVOLVEMENT IN PARTNERSHIP MATTERS OF ALL PARTNERS, AND UNDERTAKES AND AGREES TO DEVOTE SUCH TIME AND ENERGY AS IS REASONABLY NECESSARY TO ASSIST IN THE MANAGEMENT OF THE PARTNERSHIP'S BUSINESS AND MAKE HIM/HERSELF AVAILABLE FOR PARTICIPATION IN MEETINGS OR IN ACTIONS BY WRITTEN CONSENT, AND HAS SUFFICIENT EXPERIENCE AND KNOWLEDGE OF BUSINESS AFFAIRS TO ALLOW HIM OR HER TO INTELLIGENTLY EXERCISE HIS/HER POWERS AS A PARTNER.

**IN WITNESS WHEREOF,** The partners have entered into this Agreement as of the date aforesaid.

Name of Partner_____

Name of Partnership_____

Address_____

Telephone Number_____

Partner's E-Mail Address _____

Fax Number _____

Date_____

### Partner's Biographical Data

Gross Income Last Two Years_____     Description of Business Experience _____

Highest Education Level Attained_____     _____

Occupation/Profession (Last 10 years)_____     Management Interest_____

Total Net Worth Excluding Principal Residence $_____     Special Licenses or Expertise_____

Partner's Age_____

X

## Royalty Participation Partnership Contribution Record

Name of Partnership _____

Contributor's Name _____

The undersigned hereby declares as follows:

(a) By signing where indicated below, I have become a Partner in _____ Partnership (referred to as the "Partnership") formed pursuant of the terms and conditions of the Partnership Agreement I have received

(b) I have read the description of the partnership in its entirety, and in particular the use of proceeds and risk factors set forth, understand its contents, and agree to be bound by all the terms of the Partnership Agreement.

(c) I understand that the Partnership intends to working capital to Freedom Wireless Inc.

(d) My interest in the Partnership is evidenced by the number of Units allocated to me, as set forth below.

(e) I understand that this participation in this Partnership is speculative and risky and I could lose my entire investment.

(f) I understand that I am a partner, and as such (i) have the absolute right to vote on all matters concerning the Partnership, (ii) may become involved in the day-to-day management of the Partnership and in the decision-making in accordance with the terms of the Partnership Agreement.

I SPECIFICALLY ACKNOWLEDGE AND UNDERSTAND THAT I AM A PARTNER OF THIS PARTNERSHIP AND THEREFORE MY INTEREST HEREIN IS NOT TO BE CONSIDERED A SECURITY. THIS INTEREST HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES DEPARTMENT AND I AM AFFORDED NO PROTECTION UNDER THE SECURITIES ACT OF 1933, OR ANY SIMILAR STATE ACT RELATING TO THE OFFER AND SALE OF SECURITIES.

No. of Units _____ at $ 1000 per unit - Total to be remitted: $ _____

**Type of Ownership: (Check One)**

Print Name: _____

Signature: _____

Soc. Sec. #: _____

Address: _____

City, State, Zip: _____

PHONE: Home: _____

Work: _____

E-Mail Adddress: _____

☐ Individual ☐ JTWROS

☐ Community Property ☐ Tenants in Common

☐ Corporation ☐ Partnership

☐ Tenants by the ☐ Trust or Fiduciary
    Entireties     Capacity

Accepted: _____

By: _____ Date: _____

Initial Managing Partner

XI

# Exhibit F

## Patent "067" Royalty Participation Rights Agreement

THIS PATENT "067" ROYALTY PARTICIPATION RIGHTS AGREEMENT ("Agreement") is made by and between Freedom Wireless, Inc., a Nevada corporation ("Freedom"), and Freedom Strategic Partners, L.L.C., a Nevada limited liability company ("FSP").

### Recital

WHEREAS, Freedom owns the entire right, title and interest in and to U.S. Patent number 5,722,067 (Security Cellular Communications System), including without limitation: all and all divisions, continuations, continuations-in-part, reissues, extensions and improvements thereof (collectively, the "Patent Rights"); and

WHEREAS, FSP desires to participate in the royalties expected to be realized from the enforcement and licensure of the Patent Rights in the 48 largest United States Metropolitan Trade Areas (MTAs) as defined by the Federal Communications Commission, *excluding* the Phoenix/Tucson, Arizona service area (collectively, the "Territory");

### Agreement

NOW THEREFORE, for and in consideration of the mutual covenants and agreements contained herein and in reliance on the representations and warranties set forth herein, and the benefits to be derived therefrom, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

**Assignment.** Subject to the terms hereof, Freedom agrees to assign to FSP, thirty percent (30%) of all royalties realized from the enforcement and licensure of Patent Rights within the Territory, exclusive of any awards or payments of punitive or special damages (the "Royalty Participation"). In exchange, FSP agrees to grant Freedom membership interests representing not less than seventy-five percent (75%) of the contributed capital and outstanding voting rights of FSP.

**Payments.** Freedom shall pay FSP's Royalty Participation, if any, on a quarterly basis as such cash monies are received by Freedom. Freedom shall provide FSP a detailed accounting of all amounts due and/or paid to FSP for each fiscal year, within ninety (90) days of the end of the respective fiscal year. The parties expressly acknowledge and agree that Freedom will pay, and FSP will receive, FSP's Royalty Participation hereunder, *if and only if* Freedom realizes and receives cash royalties from the enforcement and licensure of the Patent Rights within the Territory.

**Expense Contribution.** The parties agree that FSP shall be solely responsible for and shall pay the initial costs and expenses of enforcing, maintaining and licensing the Patent Rights, including without limitation, legal and litigation-related expenses and administrative expenses and salaries, up to a maximum of $6,000,000 (the "Expense Contribution"). FSP's Expense

Contribution shall be paid in furtherance of FSP's business, pursuant to sections 161 and/or of the Internal Revenue Code of 1985, as amended. If FSP's Expense Contribution hereund should be more or less than $6,000,000, the percentage of FSP's Royalty Participation shall adjusted pro rata according to the relative proportion of the actual amount of FSP's Expense Contribution to $6,000,000. Freedom shall be solely responsible for all final decisions regar enforcement, maintenance, licensure and abandonment of the Patent Rights, including legal representation and settlement decisions.

Additional Participants. Freedom acknowledges that FSP may organize up to 20 general partnerships, each comprised of up to 500 partnership units, for the purpose of administering the expected Royalties from the identified MTA(s) to be assigned to each partnership. In exchange for FSP's contribution of its rights hereunder to the respective partnerships, FSP will retain an interest in each partnership representing not less than twenty-percent (25%) of the voting rights and capital of the partnership, as represented by the partnership units.

Term. This Agreement shall have a term of ten (10) years unless extended by separat written agreement.

Limitations. This Agreement does not create any agency or other relationship betwee the parties; nor does it convey any warranties or representations by Freedom, including withou limitation, those regarding the validity, superiority or value of the Patent Rights. This Agreem does not concern or include any matters pertaining to the application, enforcement, maintenan or licensure of the Patent Rights in any jurisdiction or location outside of the Territory defined herein, and, specifically excludes foreign—i.e., non-U.S.—countries and jurisdictions.

Transferability. FSP may not sell, transfer, assign, pledge or hypothecate its rights hereunder without the express written consent of Freedom.

SIGNED this 1st day of August 1993.

FREEDOM WIRELESS, INC., a Nevada corporation

Name: Larry Day
Title: President


FREEDOM STRATEGIC PARTNERS, L.L.C., a Nevada limited liability compa

Name: Lanny C. McCandles
Title: Managing Member

A-3

# Exhibit G

# Freedom Strategic Partners, L.L.C

## General Business

The Rights to Royalties and License fees to be paid by all United States
users of the Pre-Paid Switch-Based Debited Call Processing Technology For
Wireless PCS and Cellular Telephone Systems
*United States Patent Number 5,722,067*

DLJ 0402



# CONTENTS

U.S. Patent Number 5,722,067 ............... Page 3

Validity of Patent Number 5,722,067 ............... Page 3

Value of Patent Number 5,722,067 ............... Page 3

Estimated Value of Royalty Shares ............... Page 4

Assumptions ............... Page 4

Partnership Highlights ............... Page 4

Budgeted Proceeds ............... Page 5

Use of the Proceeds ............... Page 6

Summary ............... Page 7

Organization ............... Page 7

Risk ............... Page 8



DLJ 0403

## U.S. Patent Number 5,722,067

The patent was issued in February 1998, to Freedom Wireless Inc. The patent covers what has been described as the "transparent" method of allowing a cellular or wireless customer to make prepaid telephone calls on a wireless or cellular network. The method is described as "Switch Based Debiting" and is the most widely used method in the wireless communications industry for processing pre-paid cellular telephone calls. In June 1988, the company began sending notices throughout the United States to parties who the company believes may be required to obtain a license from Freedom Wireless Inc. in order to continue use, use, make, offer for sale or sell the technology that is covered under the patent.

## Validity of the 5,722,067 Patent

It is supported in patent law that there exists a statutory presumption of the validity of the patent. In other words, to be granted relief from the enforcement of a patent, the defendant or requesting party bears the burden of proof in an infringement litigation matter or any matter challenging the validity of one or more of the claims of a patent, whether the matter is an administrative or court proceeding. Specifically, _United States Code Title 35, Sections 281 through 285_ addresses the presumption of validity of each claim in a patent. Therefore, once a patent has been issued, any challenger to the validity of a patent claim has the burden of overcoming the presumption of validity set forth in the above referenced code if any relief is to be granted to them. All that is required by law to benefit from the rights granted under United States Code Title 35 is:

1. A valid and enforceable patent.
2. The right to prohibit others from using the invention unless a licensing or maintenance fee is paid to the owner of the patent.

By virtue of its' granting the patent, the United States Patent Commissioner according to the United States Code (cited above) grants to Freedom Wireless Inc. (the owner) the right to collect licensing or maintenance fees.

## Value of the Patent

In January 1998, two independent expert groups were commissioned to evaluate the future royalty and licensing fees that could be expected for Freedom Wireless as the owner of the patent. That study is identified as; _"The Potential Value of a Basic Patent Covering Switch-Based Debiting in the Emerging U.S. Market for Prepaid Wireless Telephone Service"_, and it concludes that the estimated potential value of the patent could be as much as $597 million. The study was completed by, **The International Licensing Network, Ltd. & Analysis Group/Economics** and it quantifies in 1998 dollars, the value of the predicted cash flow that might be received as royalties from licensing the patent to various users. The study presents a thorough examination of the reasons for value placed on the patent. In summary, the total estimated value taken from the independent study from page number two, paragraph two is as follows:

3

DLJ 0404

"Based on the information reviewed to date and the analyses contained herein, it is our opinion that the potential value of the patent is approximately *US $146 million, with a substantial upside potential of $597 million*".

–Analysis Group Economics
International Licensing Network

## Estimated Value of the Patent Royalties

The royalty estimates developed by the author's of the patent valuation study are based on the number of individual customers benefiting from the use of the technology covered under the patent. A gross estimate can be predicted for revenue models for FSP's 30% royalty share according to its' agreement with Freedom Wireless. Using the value of future income from the valuation study of $597 million, FSP's share would be net pre-tax royalty on approximately $179 million in revenue.

## Assumptions that Predict Freedom Strategic Partners' License Fees

- ♦ Estimated total value of the patent royalty stream of $597M.
- ♦ FSP is entitled to 30% of pre-tax income from royalties.
- ♦ FSP's predicted revenue is 30% of $597M or $179M.
- ♦ FSP's Partnerships would each be entitled to 1/20 of the total U.S. license pre-tax royalty income.

## Partnership Highlights

Basically, the partnerships are each entitled to 1/20 of the total predicted revenue from the patent licensing process. These partnerships are defined and operated according to the Partnership Agreements and are the final documents in the governance and operation of the partnerships and in defining participation. These are the general highlights:

- ♦ Each partnership will consist of 500 units, all with voting rights and completely vested.

- ♦ Of the 500 units, one-hundred twenty-five units (25%) will be allocated to Freedom Strategic Partners, L.L.C. (FSP) in exchange for its' royalty rights, organization fees, management services and general services. FSP will serve as the Initial Managing Partner. Three hundred seventy-five units will be allocated for individual partners to receive in exchange for a capital contribution of $1,000 per unit.

- ♦ Any individual, subject to the approval and acceptance by the Initial Managing Partner, may receive units in any number for capital contributions according to the "Partnership Agreement".

DLJ 0405

♦ The partnerships will last for ten (10) years from the date of the first capital contribution made on behalf of any partner.

♦ Distributions of royalties to the partnerships due under the agreement if received from Freedom Wireless Inc. will be made on the first day of any quarter for the quarter ending ninety days prior.

♦ Each partnership is expected to fund a maximum of $300,000 of the total budgeted expense related to the royalty process.

♦ Subject to a vote and approval of the partners, all royalties net of costs and expenses, received from Freedom will be distributed periodically to the partners according to their pro-rata share.

♦ All relevant developments made in the process of enforcing the patents will be available for review by the partners on the world wide web at the internet address:

www.rppatent.com

as well as all relevant partnership business including budgets, financial statements, reports of royalty earnings, elections; etc.

*(Web site is currently under construction)*

## Budgeted Proceeds

The budget for each partnership for the first four years, that is the use of the proceeds from the capital contributions will be as follows:

| | |
|---|---|
| Proceeds | $ 375,000 |
| Use of Proceeds | |
| Operating Expenses | $ 75,000 |
| Enforcement & Licensing Expenses | $ 300,000 |

The Initial Managing partner will retain in the partnership accounts for the duration of the partnership an initial sum of $75,000. Over the life of the partnership, the Managing Partner will pay from these funds the operating costs of the partnership such as those for record keeping, accounting, tax returns, legal costs if any, and other fees or expenses necessary to manage the partnership and its relationship with FSP. Partners will be provided with an accounting of the partnership funds at least every thirty days and upon any partner's request within 10 days. Eighty-percent of the partnership capital contributions received will be used to pay expenses related to enforcement and licensing

DLJ 0406

of the patent limited to a total of $300,000. Twenty-percent will be retained to fund the operating expenses of the partnership limited to a total of $75,000 as mentioned above.

There will be no minimum number of units funded in the partnership. However, the "Patent '067 Royalty Rights Participation Agreement" does specify that only a pro-rata share of royalties will be paid to a less than complete partnership. (e.g. if $100,000 is contributed as capital from a particular partnership, it will be entitled to 33.33% of the maximum royalty payments defined in the "067 Patent Royalty Rights Participation Agreement").

### Use of the Proceeds from the Royalty Participation Partnerships

In it's agreement with Freedom Wireless Inc., FSP agrees to provide $300,000 in working Capital from each partnership for the purpose of paying the expenses of maintaining and licensing the patent. "Maintaining and Licensing" means the process of identifying and notifying the parties that the company believes need a license agreement, constructing and executing those agreements and accounting for royalties.

The projected budget for accomplishing the enforcement and licensing phase of Freedom Wireless' Business plan for four years is as follows:

| | |
|---|---|
| **Legal and Litigation Expenses** | $ 2,000,000 |
| **Facilities and Services** | |
|     **Rent and Utilities** | 192,000 |
|     **Other** | 8,000 |
| **Personnel and Salaries** | |
|     **Administration** | 475,000 |
|     **Patent Technical Support** | 320,000 |
|     **Licensing** | 515,000 |
|     **Clerical and Support** | 440,000 |
| **Licensing and Contracting** | |
|     **Travel Related** | 460,000 |
|     **On-Site Accommodations** | 420,000 |
|     **On-Site Contract Labor** | 260,000 |
|     **Media and Marketing** | 360,000 |
| **Budgeted Reserve** | 550,000 |
| **Total** | $ 6,000,000 |

6

DLJ 0407

## Summary

It is the solitary business of Freedom Wireless Inc. (the company) to enforce its rights provided by ownership of patent '067. The company believes it may take as long as four years before royalties if any are received as a result of its' enforcement and licensing activities. The company, however, believes in the validity of the patent and is allowing certain individuals to participate in the predicted benefits of ownership of the patent through its association with Freedom Strategic Partners, L.L.C.

## Organization

This document does not constitute a solicitation for an investment in the securities of any company. This document reveals the requirements and possible benefits of participation in a general partnership. The purpose of the general partnership(s) is to pay the expenses and administer the expected royalty process related to patent licensing and maintenance in exchange for the right to participate in the patent holding company's predicted future income from its ownership rights under U.S. Patent Number 5,722,067 The partnerships are authorized to be formed by Freedom Strategic Partners, L.L.C., (FSP) a Nevada Limited Liability Company, for which FSP will act as the Initial Managing Partner. FSP has entered into an agreement with Freedom Wireless Inc. (the owner of the Patent) to form and manage the partnerships and takes full responsibility for their organization and management subject to the "RP partnership Agreement". For its participation FSP will be granted 125 partnership units from a total of 500 available units in each partnership.

Lanny C. McCandles
Managing Member
Freedom Strategic Partners, L.L.C.

2401 West First Street
Tempe, Arizona 85281
(602) 664.1050

DLJ 0408



## RISK

There are real risks involved in participating and no assurances can be made that any income will ever be received from its patented technology. Each individual should carefully investigate the information provided regarding the patent and its worth and make a decision to participate only on its suitability for them. The partnership units are not securities and have no marketability as such. The partnership capital contribution value is arbitrary and does not necessarily reflect a true or fair value.

ANY MONEY CONTRIBUTED TO THE PARTNERSHIP REPRESENTING THE INDIVIDUAL CAPITAL ACCOUNTS OF THE PARTNERS (CALLED PARTNERSHIP UNITS) SHOULD BE CONSIDERED A LONG TERM INVESTMENT WITHOUT LIQUIDITY. ALTHOUGH THE PARTNERSHIP MAY BE ENTITLED TO IMMEDIATE REVENUE IN ACCORDANCE WITH ITS PARTNERSHIP AGREEMENT, IT IS ESTIMATED THAT INCOME UNDER THE AGREEMENT MIGHT BE ACCRUING TO THE PARTNERS BUT MAY NOT BE ACTUALLY RECEIVED FOR QUITE SOME TIME. IN FACT, THERE IS A POSSIBILITY THAT EACH PARTICIPANT COULD LOSE HIS OR HER ENTIRE CAPITAL ACCOUNT AND RECEIVE NO FUTURE DISTRIBUTIONS. THEREFORE, PARTICIPATION IN THE PARTNERSHIP SHOULD BE CONSIDERED ONLY BY THOSE WHO CAN DO SO KNOWING THAT THERE WILL BE NO IMMEDIATE CASH DISTRIBUTIONS TO THE PARTNERS, IF ANY, IN THE NEAR FUTURE OR OTHERWISE *AND* THAT PARTICIPATION SHOULD BE CONSIDERED BY THOSE FOR WHOM IT WILL HAVE NO ADVERSE AFFECT ON THEIR PERSONAL FINANCIAL HEALTH OR WELL BEING SHOULD THEIR CAPITAL ACCOUNT NOT BE RETURNED TO THEM BY MEANS OF A DISTRIBUTION OF PROFITS OR EARNINGS RECEIVED BY THE PARTNERSHIP. PARTICIPATION IN THIS PARTNERSHIP IS RISKY AND SHOULD BE CONSIDERED SO FOR FINANCIAL PLANNING PURPOSES.

8

DLJ 0409

**MANAGEMENT**
Freedom Wireless, Inc.

---

<u>Douglas V. Fougnies - Chairman & Chief Executive Officer</u>
Mr. Fougnies will contribute multiple patent applications beyond his current contribution and will assume all management responsibilities required during the enforcement process. He will be key in any litigation that may arise from the enforcement of the Company's licensing strategy. He is the founder of Cellular Express Inc., one of the largest cellular retail distributors in the Southwest Region of the U.S. He has been in the wireless communications industry since its beginnings in 1986 and has been recognized as a pioneer and innovator in the wireless industry. Mr. Fougnies worked at Motorola's Two-Way Radio Division as a marketer. In 1995 he was named "Entrepreneur of the Year" in the Southwest Region of the U.S. for Inc. Magazines' annual award co-sponsored by Merrill Lynch and Ernst & Young. The honor was in recognition of the development and creative retail marketing of the Patented Technology used to offer Prepaid Wireless services. Mr. Fougnies is a co-inventor of Patents 5,722, 067 and 5,854,975 and the inventor of Patent 5,778,313.

---

<u>Larry L. Day - President</u>
Mr. Day serves as President and assumes responsibilities to negotiate and implement Freedom Wireless' licensing and contracting strategy. Mr. Day joined the organization in 1994 and financed the expansion of Cellular Express, Inc. from the then single store operation to the multiple retail operating stores currently distributing wireless products and services throughout the Southwest Region. Mr. Day was heavily involved in lobbying the Federal Communications Commission (FCC) throughout 1995-1996 and provided live testimony in several hearings on behalf of the "C Block" and reseller community in order to persuade the FCC to support free and fair competition to wireless entrepreneurs nationwide. He further successfully negotiated and syndicated a $25 million dollar facility to invest in NextWave Telecom, Inc. the largest "C Block" licensee who controls the third largest wireless network property in the U.S. Prior to joining the company, Mr. Day spent 12 years in the financial services industry as an associate with BMA Financial Services which is a wholly owned subsidiary of the $50 billion international insurance and financial services corporation known as Generali domiciled in Trieste, Italy. He served for two years as the BMA Field Advisory Board Chairman and was involved in negotiating compensation and other matters for and on behalf of BMA's national sales associates and the Company. Generali is the 65th largest company in the world and operates throughout the U.S. and 50 foreign countries.

---

<u>Dan Harned - Vice President of Engineering and Chief Technical Officer</u>
Mr. Harned will continue to offer support to Mr. Fougnies in the development of additional patent claims and will be called on as an expert during any potential enforcement litigation. He is a co-inventor of Patents 5,722,067 and 5,854,975. Prior to joining the company, he spent four years in the capacity of Senior Software Engineer for Orbital Sciences - Launch Services Division in Arizona. His responsibilities at Orbital included program development and implementation for imbedded processor control systems for various defense systems' rocketry projects. Prior to Orbital, he served as a software engineer and group development leader for Motorola Advanced Semiconductor Materials Division and as a consultant and software engineer for Space Data Corporation (SDC) during which time he developed space shuttle control and communications systems for NASA. Before his time at SDC, he was developing and implementing software control systems for Lumonics Corporation and Sperry Flight Systems. Mr. Harned has valuable patent development experience, which compliments his technical expertise, and has an extremely in-depth knowledge of the technologies used and contemplated for use in the wireless communications industry.

DLJ 0410

# Exhibit H

# FREEDOM WIRELESS, INC.

October 14, 1998

Mr. Don H. Berry
PO Box 1153
22 W. River Street
Hiawassee, GA 30546

*Chris Bowman*
*1 800 305 0967*

*Doug Feignes*

*www. USPTO. GOV*
*Patent # 5722067*

Dear Mr. Berry:

The call you received from Loren was to enable us to put in your hands information regarding the current **"Pre Paid – One Stop"** case, and information regarding **The Patent ("067")** that was recently issued to Freedom Wireless, Inc. It is a patent that has been conservatively appraised at $ 597 Million, and we believe that you could have an opportunity to participate in its royalty income.

### Pre Paid  - One Stop Wireless

U.S. Patent "067" is a technology that permits transparent pre paid cellular phone service to be offered by cellular phone companies or businesses (like "Pre Paid – One Stop"). We invented it back in 1994 and applied for a patent on it in Dec. 1994. In 1995 we licensed "Pre Paid – One Stop" to use our technology and our relationship with them was that of a licensor/vendor. They breached our agreement and defaulted in the licensing contract and today we are the **largest single creditor** having a claim filed in their current Chapter 11 bankruptcy. **They actually owe us $ 2.6 million.** There are several other creditors whose claims total about $ 300k. The total amount of claims for creditor debt is almost $ 3 million.

They filed for Chapter 11 bankruptcy back in February 1998 in the Federal Court in Delaware. It has since been moved to the Central District of California, in the city of Santa Ana. They filed on the very day of, and to avoid the arbitration hearing that would have awarded us a default judgement for the  $2.6 million that they owe us. "Pre Paid – One Stop" management was even asked by the U.S. Attorney why they were filing a Chapter 11, seeing they had nothing left to reorganize, and suggested that they should be filing a Chapter 7 (liquidation bankruptcy).

Of the almost $ 60 million that "Pre Paid – One Stop" raised, from the approximately 5,600 investors like yourself, there is **only** about $2.6 million left. **Where is the other $ 57 million?** We have some insight into that and will share that with you when we speak over the phone. The $ 2.6 million that remains is currently sitting frozen by the court in an escrow account and those funds will remain there pending the outcome of the bankruptcy, which is still in progress.

Here are some questions that we would like to answer for you, or provide insight to.

4685 South Ash Avenue, Suite H-5  •  Tempe, Arizona 85282
602-664-1050 • Fax: 602-664-1056
*602 - 266 5126*

BERRY 0016

Page 2
October 14, 1998

- What _really_ happened with "Pre Paid – One Stop"?

- What happened to the other $ 57 million?

- Will the investors get anything back, and how much?

- What is to become of the remaining $ 2.6 million in the escrow account?

- How do the "Pre Paid – One Stop " investors have an opportunity to share in the royalty income off of U.S. Patent "067"?

We would like to address these questions, but ask that you look over the material enclosed first.

Read over the three biographical pages so you have a better understanding of who we are. Then take the time to read through the first ten pages of the **"SYNOPSIS"** document. This will provide you with information on our U.S. Patent "067", its value, and how there could be an opportunity for you, as a "Pre Paid – One Stop" investor to share in its rights.

We can be reached at 800-305-0967, or we will be following up with you within 10 days to answer these questions.

Sincerely,

Douglas V. Fougnies
Inventor and Founder

Jovan Vercel
V.P. Business Development
602-266-5126

DVF/JV:ls
Enclosures

**BERRY 0017**

## MANAGEMENT
Freedom Wireless Inc.

**Douglas V. Fougnies - President, Chairman and Chief Executive Officer**
He is the founder of Cellular Express Inc. which was the largest Bell Atlantic Mobile (Cellular One) cellular retail agent in the Southwest Region of the U.S. throughout the decade of the '90's. He has been in the cellular communications industry since its beginnings in 1986 and been recognized as a pioneer and innovator in the cellular industry. In fact from 1996 to present he has been the largest agent for Airtouch Cellular in the State of Arizona. He has served as Custodial Agent for Telecommunications for the Arizona Attorney General and is considered an expert in the telecommunications field. Mr. Fougnies also served with Motorola in its Two-Way Radio Division in Marketing. In 1995 he was named "Entrepreneur of the Year" in the southwest region of the U.S. for Inc. Magazines' annual award co-sponsored by Merrill Lynch and Ernst and Young. That honor was largely in recognition of the work and development of the patented technology that he was bringing to market. Mr. Fougnies and Mr. Dan Harned are the developers and inventors of the technology for which the U.S. Patent # 5,722,067 and #5,778,313 were issued and referenced earlier.

**Dan Harned - Vice President of Engineering and Chief Technology Officer**
Mr. Harned is the co-developer and collaborator with Mr. Fougnies in the technology called the Cellexis System that eventually resulted in U.S. Patent Number #5,722,067 being granted to Freedom Wireless Inc. Prior to joining the company he spent four years in the capacity of Senior Software Engineer for Orbital Sciences - Launch Services Division in Arizona. His responsibilities at Orbital included program development and implementation for imbedded processor control systems for various Defense Systems' rocketry projects. Prior to Orbital, he served as a software engineer and group development leader for Motorola Advanced Semiconductor Materials Division and as a consultant and software engineer for Space Data Corporation during which time he developed space shuttle control and communications systems for NASA. Before his time at SDC he was with Lumonics Corporation and Sperry Flight Systems with responsibilities for developing and implementing various software control systems. Mr. Harned has valuable patent development experience, which compliments his technical expertise, and has an extremely in-depth knowledge of the technologies used and contemplated for use in the wireless communications industry.

**Larry L. Day - Vice President, Director, Chief Financial Officer.**
Mr. Day is Senior Vice President in charge of New Business Development. Prior to joining the company Mr. Day spent 12 years in insurance underwriting, financial analysis and planning, resource and portfolio management as an associate with BMA Financial Services which is a part of the $ 47 billion international insurance and financial services corporation known as Generali. Generali is the 65th largest company in the world and operates in the U.S. and 50 foreign countries. He served as BMA's Advisory Board Chairman and three times qualified for the Million-Dollar Round Table.

**BERRY 0018**

## MANAGEMENT
**Freedom Strategic Partners, L.L.C.**

### Lanny C. McCandles - Managing Member

Mr. McCandles has broad experience covering twenty years in the management and development of communications companies in the television, cable television, telephone and data, voice and video information delivery industries. His experience includes management of both small and very large private and public companies. In his career he has served as an advisor or consultant to semiconductor giants Motorola and SGS Thompson, Sony American Corporation, American Broadcasting Corporation, SA Television Entertainment Corp., Hitachi Corp., Panasonic and the Parry Corp. of Australia in its Americas' Cup Challenge Organization. Mr. McCandles also has extensive experience in the investment banking industry as it relates to funding and developing emerging companies. He brings a 20 year spotless record before the SEC and NASD.

BERRY 0019